Good morning, Your Honor, and may it please the Court, Cecilia Wong for the Plaintiff's Appellants and the Certified Class. Good morning. Good morning. Arizona's Proposition 100 is a bail statute that is unprecedented. It is a categorical prohibition on pretrial release that covers an extraordinary range of criminal charges. Well, it's not unprecedented in the sense that there are categories of cases, including capital cases, where bail is categorically denied. What's unprecedented is the scope of Arizona's broadening it to include Class I, II, III, and IV felonies. That's precisely right, Judge Tolman. But I guess the thing that's different than all of the other cases where we're talking about no bail is here we have people that have no right to be here. So if a person has no right to be in the country at all, why would it shock the conscience for the person to be held without bail after being arrested for committing a felony? Well, Judge Callahan, the test of the Supreme Court's Salerno decision is whether the law is punitive and whether it's excessive in relation to any legitimate governmental interest. Well, you can see that the government has – would you concede that the government has a serious interest in making sure that when people have allegedly committed a crime that that can be adjudicated? Yes, Your Honor. And the problem with Proposition 100 is that it strips the State courts of their ability to make an individualized determination of flight risk. There – I want to get right to the Court's question about City of Indianapolis v. Edmond, which I think goes to Your Honor's question as well. The district court made three critical errors in its due process holding. The first one is that the district court found that there was evidence of expressed punitive intent, both in the legislative record and in the media reports that were before the voters, and yet it upheld the law. That was a clear error. Second, the district court found that there was no evidence submitted either at the time of legislative consideration or in this litigation that people who have entered or remained in the United States illegally pose a greater flight risk than other defendants, and yet it said that Arizona can make a categorical assumption about flight risk rather than letting the State courts make individualized determinations. Scalia, on that point, Salerno itself involved the other prong of bail, which is danger to the community. That's right. And there's no Supreme Court case that I'm aware of, I could be wrong, that says even in the case of a capital offense, you categorically don't get bail. That's an Eighth Circuit decision, is it? Yes, Your Honor. To my knowledge, there is no – Salerno. I'm sorry, Judge Hall. Which was pre-Salerno. Right. That was pre-Salerno, that's true. So my only point is, is that when the Supreme Court in Salerno was going through the structure of – and this is in the case of the Bail Reform Act – I read Salerno as at least danger to the community, saying it's okay to identify serious crimes where the likelihood of danger to the community is high. But in every case, and certainly the cases it was dealing with in Salerno, there is the individualized determination as to whether the status that brings them before the court equates to danger to the community. And it says there are two elements. Even if the Congress in that case didn't say it was intending to punish, the second prong of the analysis, as I understand it, has to look at whether it's excessive, because in that case you can determine that it may not have said it, but it is in fact punitive. And the two elements that Salerno focused on in danger was that there was, A, the individualized assessment of whether the individual was in fact a danger, and secondly, that there were no alternative means to assure public safety. The Edmonds reference that you made introduces the question, because in Salerno the evidence of congressional intent to punish. What caught my interest, at least in the district court's opinion, she did find that there was evidence of intent to punish, but it was a mixed motive thing. And in Edmonds, which is a Fourth Amendment case, although there's language suggested that applies outside the Fourth Amendment, they looked at primary and secondary motive. So that's my approach to this case, trying to understand, applying Salerno, what we do when we go to the other side, which is a different consideration, the flight risk is different from danger. But here we have a case where there's some element of evidence of actual intent to punish. That's right, Your Honor. Is that true? Can you help me, Ms. Wong? I'm looking at page 10 of Judge Bolton's March 29, 2011, order at line 7, where she says, after reviewing both the voter pamphlet, the legislative hearing testimony, and the news media publications, the court finds that the voter materials and media coverage do not establish that Proposition 100 has a punitive purpose. Is that not an express factual finding that does not support your opening statement? Well, Your Honor, earlier in the opinion, I believe on the previous page, Judge Bolton found that there was, in fact, both evidence of punitive statements and statements going to flight risk. And she said on whole, she would find that the motive was not punitive. Well, let's look at the language, because you're going to have to help. That's not how I'm reading what she said. I'm looking at line 11 on page 9 of the court's order, in which she said, the court considers the materials and media to which voters were exposed to be neutral on the question of punitive intent. The voter materials contain some official statements reflecting a punitive purpose, but ultimately the message was mixed. So is your argument that I should declare that to be a factual finding when, on the very next page, I have an express factual finding that says it has no punitive purpose? The answer is no, for two reasons. First, we're here on the grant of summary judgment for the defendants, which means the court is reviewing this de novo. The court that Judge Bolton was not in a position to make findings of fact since we were at the summary judgment stage. But the second reason, Judge Hellman, is I would actually point to lines 5 and 7. Well, if she's not in a position to make findings of fact, you're saying there was a finding of fact that it was punitive, but now you're saying when it says that it wasn't punitive, that's not a finding of fact. They're either all not finding of facts or there's some finding of facts. So I mean, I hate to pick up on what you just said, but it's slapping me right in the face. Right. Well, I think there's you've pointed to a third reason why I don't think this should be treated as a finding of fact by the court, and that is that the punitive isn't a finding of fact either, then. Well, Your Honor, I was about to say that I think under Ninth Circuit case law, legislative intent is not a finding of fact. That's a legal conclusion. So I wanted to, I did want to. But the question, is it not, is under the winter factors, did the district court abuse its discretion in denying the preliminary injunction that you sought? And the court can't do that in a vacuum. The court has to look at the record before it. And Salerno tells the court, you must evaluate for Eighth Amendment purposes whether or not there's evidence of legislative intent as punitive. Your Honor, this was. I'm sorry. This was not a preliminary injunction motion. This was summary judgment. Okay. So it's not the preliminary injunction standard. I did want to point out. Salerno, let's assume, let's assume, because the district court's opinion, whether it's finding of fact or not, she does talk about evidence on both sides and says it's mixed. So we can resolve that. But let's assume that she did not find it was punitive. Neither did the Supreme Court in Salerno find there was any evidence of congressional intent in the legislative history. But it didn't. The next step we have to go to is excessiveness. So why don't you address excessiveness? Yes, Judge Fischer. Prop 100 is excessive for several reasons. The first reason is that on this record we have shown that not only does Proposition require the detention of people whom the State court has found not to pose a flight risk, it actually has resulted in the detention of people whom the State court has found not to pose a flight risk. We see this through record testimony both of Maricopa County attorneys, prosecutors, and the Maricopa County Sheriff's Office, which testified that at the time Proposition 100 went into effect, people who had been released on bail by the Arizona State courts and who had been appearing in court were suddenly remanded into custody because of Proposition 100. It is in fact and by definition excessive because it does not address flight risk. Now, let's go back to Judge Callahan's question. You concede, do you not, that ICE would have the authority to pick up any of these people and to detain them under Damore v. Kim for a reasonable amount of time? Yes, but they didn't. You can answer that question. Thank you, Judge. The answer is, well, no. ICE can't pick people up under Damore v. Kim. Damore v. Kim is about a particular detention statute that applies only to people who have been convicted of certain very serious crimes defined in the Immigration and Nationality Act. But I think the gist of your question, Judge, is that the issue, if Proposition 100 were geared toward addressing the problem of ICE picking up people and removing them while the State criminal case is still in process, there is a way for the State to deal with that that is far more narrowly tailored than a categorical prohibition on bail. But that was one of the issues that Maricopa County Attorney Andrew Thomas testified about, did he not? Yes, that's right, Your Honor. And I would submit — Was there a problem? Yes. There was one anecdote that the Maricopa County Attorney submitted to the legislature where someone had been deported while he was out on bail in the State court. Back and murdered a Phoenix police officer. That's right, Your Honor. And I think that there were two. But that doesn't mean that Prop. 100 was not excessive in relation to its purpose. Well, I guess I'm trying to — that having been a California trial judge, frequently you would get people that would come in. They were arrested for something. If there was an INS hold on them or if there was a parole hold on them, you could set bail in the other case, but they wouldn't go anywhere because the INS hold on them kept them in custody regardless, that the parole hold kept them. And so I'm just wondering if these people that are being picked up, obviously now if they really do have a right to be here, then obviously this doesn't apply and then we have to get into the procedural issues of how you get to that point. But that being said, if they really are not — if they have no legal status here and INS puts a hold on them, they're not going anywhere anyway, are they? That's right, Your Honor. So the case is over. That's right, Your Honor. And the Federal government has a system in place for dealing with precisely the situation, and the California courts have recognized that the fact that ICE may be interested in someone does not make them a flight risk. There is a way to deal with that from prosecutor to U.S. government. Your Honor, I would like to reserve some time for rebuttal. Thank you. Okay. Good morning, Your Honors. My name is Tim Casey and I represent the defendants, the appellees in this case. I respectfully request that this Court affirm the district court's rulings. Well, we assume that, otherwise you wouldn't have shown up. We will take the respectfully. That's good. Well, thank you, Your Honor. It is a Friday. Your Honor, let me go directly to some of the questions that the Court presented. Can you address in your remarks — I made sort of a summary because I think we're all in agreement that Salerno gives us the blueprint that we have to — or the template, anyway, that we have to follow. And there are some significant differences between Arizona's procedure and the procedures that the Salerno Court emphasized, including the consideration of alternative means of securing — in that case, dealing with danger to the community, but alternative means is also how do you assure that somebody is going to show up for trial. And secondly, the individualized determination of the fact of flight risk. In that case, there was an individualized determination, once you're picked up on a crime, of whether you were — you individually were a danger to the community. Here, the proxy for that, as I understand it, is whether you are here illegally, and that has become a proxy, and so all you get to have a hearing on, as I understand it, is whether you're here legally or not. Is that correct? You don't get a chance in these hearings to address with or without counsel whether you are, in fact, a flight risk, if you've been here 25 years, have ties to the community and so on. So could you explain how your analysis of Prop 100 fits into the Salerno template? Sure. Salerno absolutely is the blueprint, but Salerno is the blueprint also in its confines based on the law that it was analyzing, and that was the congressional intent. So if we look at the blueprint and we apply that blueprint to this, we're going to look at intent. We have two decisions, one of the district court decision, and I think Judge Tallman has addressed that at page 9 and page 10, where she does not — where Judge Susan Bolton says it does not establish a punitive intent. Oh, no. She said the legislative intent. Yeah. She didn't. Yeah. And then at page 9 also talked about voter materials and media accounts being neutral to having a mixed. So I understand the appellant's argument there, but the determination was no punitive intent. The other thing that we have here — Hold on a second. Let's just get this clear. What she says is, having reviewed the voluminous evidence submitted in this case, the Court finds that the record as a whole does not support a finding that it was motivated by an improper punity purpose. While some statements by legislators relate to controlling illegal immigration, other pieces of evidence show that Proposition 100's purpose is regulatory. So it's not like Salerno. There was no evidence of any congressional intent, anything in the record in that opinion that suggests that some of the purposes, that there was evidence that some  of the purposes, that there was a purpose. So this is not a clean finding of that there's nothing in the record to support an illegal purpose. But in any event, as I said before, that's not the end of the analysis. Isn't that correct? It is not. And, Judge Fischer, I think that even assuming a starting point analysis like that, I respectfully submit, and I'm obviously, I'm not sitting there as a Ninth Circuit judge, but I do not read Salerno as requiring a complete absence of mixed motive or absence of complete motive. That's why Edmonds is on the table, because Edmonds does talk about looking at primary and secondary purposes. And I understand that. But what we do have, and I just wanted to point out, we also have the court of appeals. It's obviously not binding, but I think it's instructive, at least illustrative for this Court, to take a look at the Hernandez v. Lynch decision, because that's the second court decision, one Federal, with Judge Susan Bolton, then the Arizona court of appeals that had determined expressly that there is no punitive intent in that. And even the concurring opinion that addresses it mentions that. Now, let's also talk about the compelling State interest, which is, I'm sorry. Counsel, I understand Salerno to say step one is whether there is evidence of an overt and express punitive intent. The next analysis still directed toward whether the statute can be determined to be punitive is to look at its excessiveness. Okay? So, you know, just because the legislature doesn't say expressly, if the State effects are punitive, it can be found to be constitutionally punitive. Isn't that correct? Yes. I agree with that assessment. But the legislature referred this to the voters, and the voters overwhelmingly approved it. And it's been a policy decision, and it's been recognized as a substantial compelling governmental interest to make sure that people attend their trial when they are accused and charged based on probable cause of a crime. What evidence is there in the record? I mean, from my own experience, and that I wonder if there's anything in the record on this, that Mexico won't give you people back. That people would, you know, in California frequently we'd have people charged with murder that would run to Mexico, and then we could never get them back. And I think when Dog the bounty hunter went to get someone in Mexico, he ended up in jail or something like that, as an aside. But is there anything in the record about if people flee to Mexico that we can't get them back? Your Honor, in candor, I'm not aware of anything in the record on that. There may be, but anecdotally. Well, I didn't find anything, so I was asking about that. We can take judicial notice of the extradition statute between Mexico and the United States, and it contains a list of extraditable offenses. But many of Arizona's, I guess, class 4 felonies, if those are the least serious of the serious felonies, are not on that list. Yes, Your Honor. You can take judicial notice of that, and yes, but you also. What do we do with that? If the least of the felonies, which are so minor as felonies, nonetheless, your argument is, a predicate for this, is that they're going to flee. Well, let me answer it this way. Damore, involving a very specific particular removal procedure, said that in the context of just merely deporting someone, it was acceptable to detain them pre-deportation for six months. Here, under a class 4 felony, if you look at the Hernandez-Lynch decision, it is punishable a class 4 penalty for a class, excuse me, a class 4 felony in Arizona is punishable by a minimum of one year in prison. So the reason I mention that. So all class 4 felonies are subject to a minimum of one year? I don't practice criminal law, and I want to be candid with the Court. Don't represent what you don't know. No. Because some look like they're eligible for time served or probation. So if you're telling us, and if you're right, that's fine. But are you saying that all class 4 felonies are subject to a minimum one year sentence? Your Honor, I would tell you I would hope I would never represent something that you don't know. Well, no, I don't want you to, and I didn't think you were, but I want to make sure. No. And what I was telling the Court is I don't practice criminal law, but what I was going off of is the Hernandez decision from the Arizona Court of Appeals that specifically addressed that issue, and I'm trying to find that particular thing. I know I was, I had it. Let me see if I can help you both. Yes, sir. I mean, isn't the definition of a felony any crime that is punishable by imprisonment in the state prison for a year or more? Yes, it is, Your Honor. Okay, but that doesn't. That doesn't mean that you have to get a year. Exactly. No, you don't. Exactly, it doesn't mean. You can still put somebody on probation even though you're not going to send them to prison. Exactly. All right. But I mentioned, I just want to put out here on page 1275, the Hernandez Court says Proposition 100 denies bail to illegal aliens charged with Class I, II, III, and IV felonies, the least of which is punishable by a minimum of one year in prison. That was the basis Judge Fischer. You say a minimum. That's just what Judge Kline was clarifying. It's not a – it's minimum in the sense that that is the felony classification, but it does not mandate a one-year sentence. No, and I think you're right. That's all I was trying to clarify. Can you answer this question in relation to Class IV? Counsel noted that, and the record shows, before Prop 100, the Arizona State judges looked at risk of flight under – and they could take into account immigration status and everything else. Those people were individualized, and individualized hearings were apparently granted bail. Is there any study of Arizona that shows that people who are illegal immigrants and are caught up in the criminal system under the felony charges are more likely to flee? In fact, if there's anything to show that those people, including those people who were released on bail, fled across the border into Mexico? No. Okay. What I do have is what the court in Hernandez and the district court has cited as a legislative record and the record showing the absence – what I argue is the absence of punitive intent. And, Your Honor, Judge Fischer, with the time I have, I would also like to address the Edmund decision because it addressed the mixed motive. And let me share with you at least why I think Edmund is something that is not dispositive for this court. First of all, the distinction, obviously, is it involved a Fourth Amendment claim. And I did search that, and I did not understand how it could arguably be extrapolated into a due process Fifth Amendment claim or into an Eighth Amendment. Be that as it may, I'm sure that someone could argue that. Fourth Amendment unreasonable searches and seizures, obviously, is a fundamental right. Both Salerno and the Carl's decision – I know I'm not saying that correctly. I'll have to find my notes. The bail is not a fundamental right. Once it's been established or once – excuse me – once it's offered, it cannot be excessive. In Edmund's, there was no probable cause to stop any of the vehicles, not even the lesser standard of reasonable suspicion. Here we have, in our case, situations where individuals have been found through probable cause to have committed a crime. They're accused of it, not yet convicted. I think that's a key distinction there. Well, now, where you're arguing that sort of your ample procedural protections in Maricopa, Maricopa didn't seem to be – you know, there were problems with the procedural, it would seem to me. But I'm not really sure how far we need to get down in the weeds. Because if someone's arrested, they have to – the rules of court – I mean, essentially, they have to be brought in within a certain period of time and arraigned. And then they have speedy trial rights and all of those things. They have a right to counsel. It seems that Maricopa isn't – I don't know, it doesn't seem like it's doing that great, or it sounds like the public defender's office says, well, we're here, but then we don't really have time to go out and see anyone until such and such a time. Is that my problem here? Do I need to be concerned about that there doesn't appear to be enough money? It would seem – No, because I – and I – Your Honor, the fact is, is that the procedural protections in place are both constitutional and statutory in Arizona. You mentioned one of them. I'm sure it was the same way in California when you're a trial court judge. You need to and you have the right to, when you're accused of a crime, to go to trial within 150 days. That's a shorter time than even the deportation allowed – the detention allowed in the DeMoor case. We also have procedural rules established by the Arizona State Supreme Court that places criminal trials ahead of civil trials. They take priority when there's a backlog. Trial lawyers like myself on the civil – Well, if they don't bring you to trial when you invoke it, then they either have to cut you free or they've got to try you or let you go, right? They've got to try you or let you go. You're absolutely – you're absolutely correct. So I don't think this Court needs to get mired down in those details. What it needs to evaluate is whether or not there's a punitive purpose in this, the lower court – Or effect, because it's excessive. Your Honor, I don't share that precision in conclusion as in that question. I don't believe that's exactly what Salerno, as I read it, holds. I believe that it has to – the effect – I mean, you can argue, if you look at capital crimes, sex assaults, sex crimes involving minors, felonies committed by people that have already been out on bail, all of those things under Arizona's Constitution, all those people accused of those crimes are denied categorically bail. And it's been a policy decision that that is for one purpose or another to the benefit of the community. The Constitution has been amended in 2006 to also add those who are accused of serious felonies who are here illegally or not, that is a policy decision. And the effect of it, I don't believe the Edmunds decision would ever permit individualized determinations based on the difference in the facts. My time has expired, but I'd be happy to answer any other questions. Okay. Thank you. Thank you very much, Your Honors. I wanted to start by addressing the issue of the possibility that Mexico would not extradite people back to Maricopa County. That, of course, doesn't really go to whether there was a finding of need for this statute, because not every person subject to Proposition 100 is from Mexico, and moreover, U.S. citizens can flee to Mexico as well. So I don't think that — But the extradition treaty applies to anybody who flees to Mexico that is the subject of a request for extradition. That's a close border. That's right. And so my point is that it's not just undocumented immigrants who pose that problem. It's everybody in Maricopa County who's subject. Well, except that in the case of U.S. citizens, they have more ties to the United States than a person who is of Mexican descent and is a Mexican citizen who gets arrested for a crime in Maricopa County, a serious felony. Well, Your Honor, I think that goes to the third serious error that the district court made here. That's that she permitted Arizona to make this categorical assumption that everyone who has ever entered or remained in the United States illegally categorically poses a flight risk, when the record actually shows that prosecutors and defense lawyers in Maricopa County agree that there were many people who were subject to Proposition 100 who are undocumented immigrants, but in fact have very deep ties in Maricopa County. But how is that different from a presumption that we apply in capital cases, which presumably is that if there's probable cause to believe you've been arrested for a murder, you are presumed in the statute to be a danger to the community and we're not going to grant you bail? Well, Your Honor, I think that capital cases are considered differently in the Constitution itself. The Eighth Amendment makes an exception for capital offenses. Okay. Take sexual assaults against children. That's also a non-bailable offense in Arizona and in many other states. Here I think we go back to the problem that courts have approved such categorical prohibitions when they're limited to the most serious of offenses and when the legislature has made specific findings that there is a link between that sort of charge and the danger of flight risk. Didn't the district court find that here, that that was the animating purpose behind Proposition 100, that the state basically had a serious problem with people fleeing the state and not appearing for trial? Well, I think there's actually distinction between what her finding was on the punitive intent and whether or not there were legislative findings to justify the assumption that undocumented immigrants pose a flight risk. Here I actually would cite one of Judge Callahan's previous opinions. It is from a First Amendment context, but I think it's instructive. This is Video Software Dealers v. Schwarzenegger. In that case, Judge Callahan pointed out that when the California legislature was trying to pass a law that banned certain video games, they were very violent games and the legislature said, we're concerned about the impact on our children. And Judge Callahan pointed out that there is a long tradition that legislatures cannot just use conjecture or anecdotes to support these kinds of restrictions on fundamental rights. And I think the same applies to a situation where people are being categorically deprived of individualized consideration for bail. But I've also read some dicta in cases talking about the difference between a full-time legislature in California and a part-time citizen legislature in Arizona. I mean, they don't have the same kinds of resources to hold full-blown evidentiary hearings like we see on Capitol Hill. Well, Your Honor, I think you're right. And it shouldn't be penalized in trying to address what they perceive to be a serious problem, should it? I think it's true that, as Judge Callahan pointed out in the video software case, you don't need to require tens of thousands of pages of empirical studies in every case. But here, Judge Bolton found that there was no evidence submitted, none, not one bit of evidence. And that, I think, is one of the most troubling aspects of the decision below. So you're not asking us to punish them for not making the findings. You're just observing that it's regulatory. That's right, Your Honor. I think that if a regulatory – if the regulatory purpose is asserted, there needs to be some evidentiary basis for it. What's troubling about this decision is that it permits a legislature to substitute its categorical assumption, absent any evidence of a link to flight risk, for an individualized determination of flight risk. And I think that is what's pernicious. If this lower court decision were to stand, then legislatures could make all kinds of categorical assumptions and render entire categories of people ineligible even for consideration by the district court, by the state court. And if I looked at the constitutional challenges to capital case presumptions, you're suggesting that I would find express legislative findings to support that statutory presumption? Frankly, Judge, I don't know whether those cases point to express findings. I think that some of the cases suggest that when someone is subject to the harshest penalty available under law, there's an inherent flight risk. Well, I think even Blackstone noted that if someone was facing death, that they would probably flee the kingdom rather than stick around to stand trial. And that may be why the founders decided to make an exception for capital offenses in the Eighth Amendment excessive bail clause. Okay. I think we have your point, counsel. Thank you, Your Honor. Thank you both. Thank you. Very well argued. Yes, it was an excellent argument. Thank you both.
judges: Fisher, Tallman, Callahan